For our last case of the day, we will call case number 23-40586, United States v. Donofrio. Did I pronounce that correctly? I probably have not. Donofrio, my apologies. Mr. Feldman. Good afternoon, your honors. I am Andrew Feldman. I represent Mr. Donofrio. I represented Mr. Donofrio in both of his trials, and I am his pro bono appellate counsel in this case. May it please the court, counsel. This case has a lot of issues, but I'll start with the most obvious issue, I believe, which is that we have the circuit court's prior opinion in Marchetti as a pretty good guide, pretty good barometer here. Mr. Donofrio in Gene Matrix performed the precise type of sales and marketing activities that this court in Marchetti held were insufficient to constitute a violation of the AKS. That's the anti-kickback statute. The panel in Marchetti called this the non-codon conduct. I'll call it the Vantari conduct, because that's what this case is about. Marchetti reaffirms many of the principles from Miles and dictates that the anti-kickback statute cannot be read so broadly to subsume permissible marketing activities, and the government must prove something about Mr. Donofrio exercising undue influence on patients' selections of health care services. So what lab they would use. That's from Marchetti at 826. Marchetti also reinforces that the interaction with the relevant decision maker has to be part of the consideration in evaluating violations of the AKS, also at 826. Here, there's no evidence that Donofrio or Gene Matrix, his company, along with his two partners, ever exercised, ever exerted undue influence over patients' selections of health care services. There's no evidence that Gene Matrix or Steve Donofrio were the relevant decision makers as required under Marchetti. To the contrary, the government does us a favor and concedes in its brief that the physicians ordered Vantari tests. The physicians ordered them. Counsel, is there any discussion in the record regarding narrowing the indictment from both the Coden and the Vantari conduct to just the Vantari conduct? Excuse me, Your Honor? Is there any discussion in the record? At the time the trial took place, it covered both. Was there any discussion at the time that the indictment was being narrowed to Coden or Vantari alone? No, I believe in the first trial, which is really not part of this appeal, there was a 404B objection that I made and that was denied. But in our brief, we do, it's not part of one of our principal arguments, but in our brief, it is an argument, or at least an observation, that the Coden slash Althea conduct of redirection is, it still remains to this day, uncharged conduct. The master redirection scheme, which I'll get into in a second, which is what Marchetti, why Marchetti was affirmed, that's not alleged anywhere in the superseding indictment or the indictment. And just with respect to the sales and marketing activity, there's abundant evidence that showed the Gene Matrix and Steve Donofrio were sales and marketing organizations with 50 to 200 sales reps. The government witnesses Parrish and Arroyo testified that they performed those sales and marketing activities and four sales representatives who we called in the defense case in chief from around the country who work for Gene Matrix testified to the same. I urge your honors to review page five of the renewed motion for release, which lists by witness all the places in the record where there's testimony relating to Gene Matrix performance of sales and marketing activities. They educated physicians about PGX tests, those are pharmacogenetic tests that save lives and prevent patients from dying. Even if this court were considering doing the same thing that the court in Marchetti did, considering affirming the conviction on the Codon conduct, the jury instruction tethering Mr. Donofrio's conviction to Ventari related conduct and Ventari related remuneration mandates a reversal of his conviction because evidence related to Ventari in Gene Matrix was insufficient to convict him. The jury was instructed that an element of the anti-kickback statute was remuneration related to Ventari. That's the record on appeal 2262-2281. It's also on page 47 of our opening brief. And I take it there was no objection, obviously, to that instruction. There's no objection to that instruction, your honor. So we're on plain error review on that issue? Not on plain, my position is not on plain error review on that particular issue, your honor, because it's not a failure to object to that instruction because we've made a rule 29 argument saying that all this evidence that came in in the government's case in chief was insufficient to send it to the jury. That was denied and the jury instructions were crafted as such. And those jury instructions that were crafted as such critically contained the words Ventari. Ventari, Ventari, Ventari. There's no mention of Codon in those jury instructions. There's no mention of Althea in those jury instructions. We must assume as litigants the jurors follow the instructions after they take their oath. And following these instructions, the jurors must have convicted Mr. Naufri of a conspiracy to violate the AKS involving remuneration from Ventari, not from Althea, not from Codon. And there was insufficient evidence at trial under Marchetti and under Miles to convict Mr. Naufri of a conspiracy involving remuneration related to Ventari. Ventari stands as a condition precedent to finding of an AKS violation, which is the object of the conspiracy. Just think about it this way. If the instructions had said Althea or Codon instead of Ventari, would the instruction allow you to find Mr. Naufri guilty of conspiracy for Ventari monies to GeneMatrix? No, it wouldn't. You have the same situation here in the reverse. If the instruction had said you can find someone guilty of robbing a bank, but that instruction is tethered to Bank 1 and Bank 2, you can't then find that person guilty of a bank that's not in the instruction. There's another reason that if the court is considering affirming this based only on what I call the Codon conduct and sort of on the same rationale as the court adopted in Marchetti, that the court can reverse insufficiency of evidence. This court has reversed lots of conspiracy convictions because a person cannot negligently enter into conspiracy, nor can a conspiracy be shown through mere associations. Actions in surrounding circumstances must be incriminating enough to prove the existence of a conspiracy beyond reasonable doubt. Here, as teed up in the government's brief, the Codon Althea conspiracy, which has nothing to do with Ventari because there's no Ventari monies ever flowing to anyone from that. The Codon Althea conspiracy at its core involves secretive transcriptions from Jessica Kahn in Ventari's fulfillment center in Tempe, Arizona. She was supposedly signing Althea requisition forms, pretending to be the authorizing physician. It also involves the complete redirection of Medicare referrals to Althea. Arroyo's words, the lead cooperator trial, both trials, that no more Medicare was coming to Ventari. That's as of April of 2015. That's an important date. But there's no evidence of any of those things. Let's start with Jessica Kahn. Jessica Kahn is not called as a witness at trial. Adam Matz, Brian Parrish, not called as witnesses at trial. These are the Codon Tempe, Arizona witnesses. There's no communications with Kahn and D'Onofrio. No emails, no discussions, nothing. And it's important to also distinguish D'Onofrio from Marchetti and segregate and distinguish the two. And Marchetti's trial which Mr. D'Onofrio was a part of, there was direct testimony about interactions with Marchetti in Tempe. He gave Jessica Kahn a gift card. He lived in Arizona. And Bill Flowers was his partner. Bill Flowers, ironically, is the one, if you look at the record on appeal, that was causing all of the problems with Althea, yet he was dismissed from the superseding indictment by the government. And even though the Bill Flowers issues were resolved, there's missing signatures related to certain Althea orders, but there's no evidence that Kahn gathered them. Anna Taylor did, and she sent them to Patricia Corville. And there's no evidence anywhere that Kahn forged a signature of a doctor. It's nowhere to be found. It's also not alleged. There's also no evidence of any problems with GeneMatrix sales representatives marketing Althea tests in comparison to problems with ALS and Marchetti's company in Althea. There's no redirection. There's no forged forms. LaRoyo testified that Ventari could not run tests from Florida or New York. Those are the exact representatives, excuse me, those are the exact doctors who ordered tests on behalf of Althea because those tests were being marketed by GeneMatrix representatives. So Althea sent the tests, excuse me, those doctors in Florida and New York, both Thomas Cipolla and Matthew Bennett, that's page 13 of 14 of the brief, they sent those tests directly to Althea with no layover in Arizona, no backroom transcriptions, no mischief. There's also no Althea Medicare claims data. So there's nothing in the record, it wasn't even admitted at any proceeding. So there's nothing in the record showing that there was any referral and any claim paid by Medicare for Althea tests. There's also no code on bank statements. So there's no evidence showing the flow of funds from, to code on from anyone, including Althea. And the one order that we have in the record is a Dr. Bartas order to Althea that's not a Medicare referral. And it's also not redirected by Kahn, Jessica Kahn. It's sent by Dr. Bartas' staff directly to Althea. And I think this issue with respect to the second object of the so-called Althea code on conspiracy is extremely significant, which is that somehow, some way, the purpose of this was to allow Mr. Arroyo to continue receiving Medicare because he wasn't going to allow any more Medicare referrals to Ventari. The problem with that is, on page 15 of our reply, page 24 of the docket, is that there are lots and lots of commission reports that were entered into evidence by the government showing those Medicare commissions being paid May, June, July of 15, August of 15, I think even all the way up to January of 2016. So there's a certain point at which, being deferential to the trial court and being deferential to the jury's verdict and their credibility findings, we have to draw a line in U.S. v. Sinclair says that. Mr. Arroyo testified to something that is demonstrably false with respect to those Medicare commission reports. It's just not true when you look at them. He says, hey, we didn't accept any more Medicare commissions, but Ventari did. I'm running out of time, so I want to briefly address venue. The government has conceded venue is only proper if it relates to conduct by Virginia Heron in the Eastern District of Texas. But that means that she has to do something to further this Althea Kodan conspiracy in Eastern Texas. There's nothing that happened in the Eastern District, Texas. It was all in California and Arizona. Miss Heron never spoke to Mr. Nafrio. She pled guilty to obstruction. She never agreed to engage in any unlawful conduct with Arroyo. She denied knowing that the commission based compensation was wrong and Supreme Court case in Kotyakis says that, you know, you have to. She has to be connected to Arroyo to be connected to Nafrio. And so there there is improper venue both constitutionally and based on sufficiency in this case. Just briefly talking about sentencing, page three of the renewed motion for release talks a lot about the sentencing in this case. Regardless of the standard that the court employs, the sentence has to be vacated because it went from a level eight to a level 22, six months to 42 months, which he's currently serving, based completely on the Ventari gene matrix, conduct, and the precise types of lawful sales and marketing activity that Marchetti says is insufficient to sustain a AKS conviction. So he's literally being sentenced on conduct entirely, the $769,000 that Marchetti says is not sufficient to sustain an AKS conviction. The government says I waived that argument. We didn't waive that argument. I think context is important. We submitted about 1,500 pages in the sentencing. I called a witness from California. There's a robust record even if we had in the court were to look at this under plain error. Ricard, a Fifth Circuit AKS case, says that errors that go to the miscalculation of guidelines and from six months to 42 months. The other sentencing issue that we preserved was the value of the bribe. These sales and marketing activities and compensation for sales and marketing never been held to be a bribe under 2B4.1 of the guidelines. They're quid pro quos. And I see I'm running out of time, so if there's nothing further, I'll reserve the rest for rebuttal. Thank you. You have reserved five minutes. Mr. Garcia. May I please report? Adrian Garcia for the United States. I want to emphasize to this panel that the case before you all is a different trial with different evidence and a different focus. This trial that's before this panel focused on Arroyo and D'Onofrio's intent to pay and receive kickbacks in exchange for arranging for Medicare business. And along the way, the government met the threshold that it previously met in the Marchetti case that the evidence was sufficient to sustain the conviction. But the government went further and it addressed the question that the Marchetti panel asked. Were the payments intended to compensate D'Onofrio for arranging for Medicare business or for his advertising services? And the jury answered that question. The payments were made for D'Onofrio to arrange for Medicare business. And the jury answered that question after considering the testimony from the two most important people that would inform the jury regarding the party's intent, Nicolas Arroyo and Stephen D'Onofrio. It also considered corroborating emails and financial records and considered their conduct. Counsel, was it discussed at the charge conference that the jury instructions seemed limited to Vantari? No, no, Your Honor. And I will say that the characterization that Vantari, the word Vantari appears in the jury instruction throughout the instruction, I think is incorrect. And I think it's, I think Mr. D'Onofrio's counsel has conflated, which is a common mistake, the conspiracy charge and the substantive charge. So if you review the jury instruction regarding the conspiracy charge here, the essential elements are all laid out and there is no reference to Vantari. It isn't until the description of the underlying substantive offense that the word Vantari is used. And I'll also note that the actual word Vantari, it's not limited to the corporate entity. In this case, Vantari is Nicolas Arroyo. And the conspiracy that was charged and considered by the jury wasn't limited to Vantari. It was Nicolas Arroyo and his entities. Where I think Mr. D'Onofrio's counsel errs is his focus is on the substantive offense and whether there was sufficient evidence to meet the threshold of the substantive offense. And that's why he spent so much time focusing on the Vantari and the substantive offense. But it's not clear whether his challenge to the inclusion of Vantari is a sufficiency argument, a lack of sufficiency argument, or if it's some sort of error in the jury instruction. But in his reply brief, he makes clear to the court that he's not challenging the accuracy of the actual judicial instructions, which if we were to go down that road, the trial court would be given substantial deference and the jury charge would be considered as a whole. There wouldn't be a narrow focus on the Vantari conduct. I also want to touch a little bit on this idea that there is some sort of separate conspiracy involving Vantari and a separate conspiracy related to Codon. First of all, I think this is where it's really important that we have a different record in this trial. Here the government focused on the intent of the parties, trying to answer that question that I went over at the very beginning. But in this trial, we had clear evidence from Nicolas Arroyo regarding to the connection between the Althea conduct and the Vantari conduct. As it's made clear in our brief and in the record, Nicolas Arroyo testified that they came up with this idea of sending all of the tests to a distribution center and then, sending all the Vantari tests to a distribution center and then based on the type of payer, redirecting either to Althea for the Medicare business or to Vantari for the private pay business in order to retain all of the referrals, including private pay to Vantari and in order for the conspirators, Arroyo, Marchetti, D'Onofrio, Parrish, to continue to be compensated for the Medicare referrals. And Arroyo testified for a day and a half on why this was so important to the conspiracy as a whole. Arroyo was concerned that if he stopped paying D'Onofrio and the distributors would redirect and steer all of the referrals, all of the Medicare business away from Vantari. It wasn't that they would stop advertising, it's that they would steer all of the referrals to a different competing lab. And so in his testimony, Arroyo was asked the question about whether this was essentially stealing from Vantari and he testified that the way that he saw it, this was a way for Vantari to continue to stay afloat by not losing the distributors wholesale, not losing their major distributors, continuing to get their private referrals. And I think that's really important because that was not present in the Marchetti record and it is present in the D'Onofrio record and it's something that this jury did consider. Moreover, I want to just caution and advise the court that a lot of the evidence that D'Onofrio's counsel uses to criticize Arroyo's testimony and attack his credibility, it's actually evidence outside of the record. It's evidence that are cited in post-trial motions, in the review bond pending appeal motions. It's stuff that should not be considered by this panel and wasn't considered by the jury. Moreover, I want to touch a little bit on the sentencing argument that Mr. Feldman answered. So the Marchetti opinion, it found that standing alone, what Mr. Feldman characterizes as the Vantari conduct, would not have been sufficient. But whether that conduct would have been sufficient in that case and whether it could have been considered by this court as part of the relevant conduct of the single conspiracy, those are two different questions. And in the Marchetti opinion, the panel did consider the total value of the bribe, not just the code on aspect of the conspiracy. It considered the total bribes that was paid in the entire conspiracy and it did affirm that sentence. So Marchetti would not change the value of the bribe calculation? No, no it would not. Now, I just want to touch a little bit on this idea of the stipulation. The record is a little muddled and it is hard to understand what were Mr. D'Onofrio's objections to the total bribe amount and what it was that he stipulated to. I'll represent to the court that our belief and understanding about the stipulations is that Mr. D'Onofrio challenged things like discounting the value of the bribe based on overhead expenses or legitimate services that were provided. However, the court considered that and rejected those arguments. It rejected the testimony from Patricia Corville. It rejected the evidence and said that it was not reliable in denying the objection. And so here, what now armed with the Marchetti panel's opinion, he's raising a new objection. And the new objection is that you should only consider one aspect of the conspiracy. But those weren't his objections at the time. Your point is that he stipulated to the baseline how he's challenging the baseline. Yes. And the baseline, the government stipulated to that amount even though it could have brought forth evidence and pursued a larger amount to actually calculate the actual total value of the bribe. So he's getting the benefit of the lower amount and raising a new objection trying to limit it to one aspect of the conspiracy. And we think that's improper. Mr. D'Onofrio's counsel didn't really talk about the idea of compelling the testimony and weighing the Fifth Circuit versus the Sixth Circuit. So I won't, I'll answer any questions that the court has, but I don't want to spend too much time on it. But I do believe that the district court engaged in a really robust process that I think went above and beyond the legal requirements that he needed to do to weigh these things, to weigh the two, the privilege versus the Sixth Amendment right. And I think he did an admirable job both letting in exculpatory, allegedly exculpatory evidence to be considered by the jury. And even if there would have been some sort of error, the jury heard from Mr. D'Onofrio and considered many of these emails that would have constituted the legal advice that he supposedly received. And so it would be a harmless error, it would be a harmless error if we were to go down that road. And finally, the advice of counsel instruction. So I just want to emphasize a point that we tried to emphasize in our briefing, but I just want to make clear. Mr. D'Onofrio did assert good faith reliance on advice of counsel throughout trial. He did it in the first, in the first Marchetti trial and he did it throughout the second trial. What Mr. D'Onofrio attempted to do was to assert the defense and then not request an instruction so that the jury would not be armed with what the law is regarding the advice of counsel defense. The trial court was within its discretion to instruct the jury on what it believed the legal principles that were applicable were. And in stating a correct statement of the law, there was no error there. And the district court has afforded substantial latitude in formulating the jury verdict as long as it's correct and it gives the jury those instructions. We are not aware of any authority that the district court is limited in its ability to propose an instruction merely because it's not proposed by the defense. Now, if there are no other questions from the panel, we'll cede our time. Thank you. Mr. Feldman, you have reserved five minutes. Thank you, Your Honors. I'll start with the sentencing. So we did not stipulate to anything at sentencing. At the forfeiture proceeding, we stipulated to the $769,000 amount. But in that same stipulation that was carefully drafted by myself and the government, I preserved my right to appeal that forfeiture order later. So we didn't stipulate to anything. What happened, and it's summarized quite extensively, I believe, in both the reply and opening brief, is that there were different stages in which that sentencing proceeding took place. But we never stipulated to anything. And Mr. — the government makes reference to relevant conduct and that somehow you can consider the sales and marketing activity or the Medicare Activity Commissions as relevant conduct. Well, what relevant conduct is it? Under Marchetti, what relevant conduct is it? Culverhouse tells us that relevant conduct has to be criminal. So what crime is it? Because it's not a violation of the anti-kickback statute after the Fifth Circuit's decision in Marchetti. The arguments we made during that sentencing were that the court should take into consideration all the performance of sales and marketing activities and credit it against that $769,000 number. We didn't have the benefit of Marchetti at that time. We have it now. We did have the benefit of a decision from the Tenth Circuit called McClatchy. But Mrs. Corville testified for about two hours. And what she testified to was every single person at G-Matrix, and she referred to them by name and talked about what they did, which is that they educated physicians about the medical efficacy of these tests. She talked about 30 or more different people. That's the exact type of lawful sales and marketing conduct that Marchetti says cannot sustain a conviction under the AKS. It can't be relevant conduct. So the other thing I want to briefly mention is that the government misquotes Marchetti decision again and substitutes the word arranged for for induce in terms of there was evidence showing that Mr. D'Onofrio intended to arrange for Medicare referrals. That arrange for language doesn't come from Marchetti. I don't know where it comes from. But Marchetti makes it very clear that there's got to be a relationship with the relevant decision maker, that there's got to be some exertion of undue influence over the person that makes the selection about the services that the patient gets. There's no evidence of that with respect to D'Onofrio, and we've detailed how all these same arguments about how D'Onofrio is sort of unlike Marchetti and that there was more evidence of D'Onofrio in the second trial are essentially recycled arguments that were all rejected, that were briefed in the Marchetti case, and they were all rejected by the Marchetti court in the Marchetti opinion that was authored by Judge Smith. In terms of the reason for the, it was a little unclear to me, but in terms of the reason that Mr. Roy established CODA and Althea and how that was a continuation of sort of the Ventari conspiracy, I think that's what the government was trying to say. They mentioned competing labs. Hey, if we don't do this, they'll go to competing labs. Well, there's plentiful evidence in the record showing the G-Matrix had established relationships with competing labs. That's why they had a relationship with Althea before, their relationship with Ventari. They had a relationship with a lab called Excel Talks. They were a sales and marketing organization. That's what you do. You educate and market to physicians about specific tests that meet the needs of those specific patients. In terms of my focus on substantive violations, the AKS versus conspiracy and their reference, the jury instruction, you can't have a conspiracy without a substantive violation under 371 the way this was charged. So the substantive violation is the violation of the anti-kickback statute. Marchetti, the court Marchetti talks about this as well. The jury instructions make it clear that an element of that violation, the conspiracy to violate the AKS is Ventari. There's insufficient evidence on the record that Mr. D'Onofrio engaged in a conspiracy involving Ventari based on Marchetti. And I see that my time is up, but I would urge this court to both vacate the conviction, vacate the sentence, and vacate the forfeiture order. Thank you.